O CENTRO ESPIRITA BENEFI-CIENTE UNIAO DO VEGETAL, also known as Uniao do Vegetal (USA)("UDV–USA"), a New Mexico corporation on its own behalf and on behalf of all its members in the United States; Jeffrey Bronfman, individually and as President of UDV–USA; Daniel Tucker, individually and as Vice–President of UDV–USA; Christina Barreto, individually and as Secretary of UDV–USA; Fernando Barreto, individually and as Treasurer of UDV–USA; Christine Berman; Mitchel Berman; Jussara de Almeida Dias, also known as Jussara Almeida Dias; Patricia Domingo; David Lenderts; David Martin; Maria Eugenia Pelaez; Bryan Rea; Don St. John; Carmen Tucker; Solar Law, individually and as members of UDV–USA, Plaintiffs–Appellees,

v.

John ASHCROFT, Attorney General of the United States; ASA Hutchinson, Administrator of the United States Drug, Enforcement Administration; Paul H. O'Neill, Secretary of the Department of Treasury of the United States; David C. Iglesias, United States Attorney for the District of New Mexico; David F. Fry, Resident Special Agent in Charge of the United States Customs Service Office of Criminal Investigation in Albuquerque, New Mexico, all in their official capacities, Defendants–Appellants,

Christian Legal Society; The National Association of the Evangelicals; Clifton Kirkpatrick, as the Stated .Clerk of the General Assembly of the Presbyterian Church (U.S.A.); Queens Federation of Churches, Amicus Curiae.

No. 02–2323.

United States Court of Appeals, Tenth Circuit.

Sept. 4, 2003.

Matthew M. Collette, (Michael Jay Singer with him on the briefs), Attorneys, Appellate Staff Civil Division, Department of Justice, Washington, DC, for Defendants–Appellants.

Nancy Hollander, (John W. Boyd with her on the brief), of Freedom, Boyd, Daniels, Hollander, Goldberg & Cline, P.A., Albuquerque, NM, for Plaintiffs–Appellees.

Gregory S. Baylor, Nathan A. Adams, Kimberlee W. Colby, of Center for Law and Religious Freedom, Christian Legal Society, Annandale, VA, filed an amicus curiae brief on behalf of Plaintiffs–Appellees.

Before SEYMOUR, PORFILIO, and MURPHY, Circuit Judges.

JOHN C. PORFILIO, Senior Circuit Judge.

John Ashcroft, Attorney General of the United States, et al., appeal an order in the United States District Court for the District of New Mexico preliminarily enjoining the government from prohibiting or penalizing the sacramental use of *hoasca*, a substance containing dimethyltryptamine (DMT), a drug listed in Section I of the Controlled Substances Act (CSA), 21 U.S.C. §§ 801–904, by O Centro Espirita Beneficiente Uniao do Vegetal, a small religious organization. We affirm.

Uniao do Vegetal, President of the Uniao do Vegetal's United States chapter Jeffrey Bronfman, and several other church members (collectively, UDV) filed a Complaint for Declaratory and Injunctive Relief and a Motion for Preliminary Injunction against the United States Attorney General, United States Attorney for the District of New Mexico, the Drug Enforcement Administration (DEA), the United States Customs Service, and the Department of the Treasury (collectively, Govern-

ment), alleging violation of the First, Fourth, and Fifth Amendments, Equal Protection principles, the Administrative Procedure Act (APA), international laws and treaties, and the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb–1. UDV sought declaratory and preliminary injunctive relief against the Government's penalty or prohibition of the church's importation, possession, and use of *hoasca* and against any attempt to seize the drug or prosecute Uniao do Vegetal members.

After a two-week hearing, on August 12, 2002, the district court granted UDV's motion for a preliminary injunction in a unpublished Memorandum Opinion and Order.[1] The court rejected UDV's arguments that *hoasca* is not covered under the CSA and prohibiting the importation, possession, and use of the drug violates the Constitution and international law. However, the court held UDV had advanced a successful RFRA claim.

For purposes of the preliminary injunction, the Government did not dispute UDV had established a prima facie case under RFRA—a substantial burden imposed by the federal government on a sincere exercise of religion. *See Kikumura v. Hurley,* 242 F.3d 950, 960 (10th Cir.2001).[2] The burden therefore shifted to the Government to show "the challenged regulation furthers a compelling interest in the least restrictive manner." *See* 42 U.S.C. § 2000bb–1(b); *United States v. Meyers,* 95 F.3d 1475, 1482 (10th Cir.1996). The Government asserted three compelling interests in prohibiting *hoasca:* protection of the health and safety of Uniao do Vegetal members; potential for diversion from the church to recreational users; and compliance with the 1971 United Nations Convention on Psychotropic Substances (Convention). Convention on Psychotropic Substances, opened for signature Feb. 21, 1971, 1019 U.N.T.S. 175 (ratified by the United States in 1980) [hereinafter Convention].

The district court required the Government to prove sacramental *hoasca* consumption poses a serious health risk to Uniao do Vegetal members and, if sanctioned, would lead to significant diversion to non-religious use. Finding evidence on the health risks to UDV members "in equi-

---

1. The district court rejected UDV's motion for preliminary injunction based on its Equal Protection claim in a February 25, 2002 order. In the August 12, 2002 order, the court held the CSA is a neutral law of general applicability, controlling drug consumption of religious and recreational users alike with the broad goal of protecting public health. The court rejected UDV's argument that *hoasca* is not listed in Schedule I of the CSA. Additionally, the court rejected UDV's argument that given the exemption to Brazilian drug laws for religious consumption of *hoasca,* principles of comity suggest the court should sanction sacramental use in this country. Finding the claims under the APA, the Fourth Amendment, and the Fifth Amendment primarily concern questions about the type of relief warranted, the court deferred ruling on these claims.

2. Note that UDV's establishment of a prima facie RFRA violation, standing alone, would have sufficed to demonstrate "a substantial likelihood of success on the merits," the first of four factors courts consider in granting a preliminary injunction. *Kikumura v. Hurley,* 242 F.3d 950, 955 (10th Cir.2001). In *Kikumura,* we held, "[b]ecause Plaintiff's request for pastoral visits appear at this initial stage of the litigation to be a protected religious exercise, and because Defendants do not challenge the sincerity of Plaintiff's religious beliefs, Plaintiff need only prove that the denial of the pastoral visits was a 'substantial burden' on his 'exercise of religion' in order to show a substantial likelihood of success on the RFRA claim." *Id.* at 961. Nevertheless, UDV's counter-evidence on the Government's alleged compelling interests serves as proof that the balance of harms and public interest, preliminary injunction factors three and four, tip in their favor.

poise," evidence on risk of diversion "virtually balanced," and *hoasca* not covered by the Convention, the court held the Government failed to meet its "onerous burden" under RFRA. Because it found no compelling government interests, the court did not conduct a least restrictive means analysis.

The district court concluded UDV demonstrated "substantial likelihood of success on the merits" and satisfied the other three requirements for preliminary injunction. First, on irreparable injury, the court noted, "Tenth Circuit law indicates that the violations of religious exercise rights protected under the RFRA represent irreparable injuries." Second, on balance of harms, the court held, "in light of the closeness of the parties' evidence regarding the safety of hoasca use and its potential for diversion, the scale tips in the Plaintiffs' favor." Finally, the court reasoned failure to vindicate religious freedom protected under RFRA—a statute specifically enacted by Congress, as representative of the public, to countermand a Supreme Court ruling—would be adverse to the public interest.

In an order dated November 12, 2002, the court delineated a remedy, preliminarily enjoining the Government from prohibiting or penalizing sacramental *hoasca* use by Uniao do Vegetal members. The court also required that the church, upon demand by the DEA, identify its members who handle *hoasca* outside of ceremonies, allow for on-site inspections and inventories, provide samples, identify times and locations of ceremonies, and designate a liaison to the DEA.

The Government moved for an emergency stay of the preliminary injunction pending appeal. On December 12, 2002, we granted the stay, holding UDV failed to demonstrate "clear and equivocal" right to relief. *O Centro Espirita v. Ashcroft,* 314 F.3d 463, 467 (10th Cir.2002).

On appeal, UDV urged us to affirm the district court, contending the Government failed to prove *hoasca* poses health risks to church members, the Convention does not apply to *hoasca,* and Uniao do Vegetal's consumption of *hoasca* is comparable to the Native American Church's exempted use of peyote. Calling for a reversal, the Government's appeal focused on the compelling interests asserted below.

## I. Background

### A. Uniao do Vegetal

Uniao do Vegetal, a syncretic religion of Christian theology and indigenous South American beliefs, was founded in Brazil in 1961 by a rubber-tapper who discovered the sacramental use of *hoasca* (the Portuguese transliteration of ayahuasca) in the Amazon rainforests. A highly structured organization with elected administrative and clerical officials, UDV uses *hoasca,* which in the Quechua Indian language means "vine of the soul," "vine of the dead," or "vision vine," as a link to the divinities, a holy communion, and a cure for ailments physical and psychological. Church doctrine dictates members can perceive and understand God only by drinking *hoasca.* Brazil, in which there are about 8,000 Uniao do Vegetal members, recognizes Uniao do Vegetal as a religion and exempts sacramental use of *hoasca* from its prohibited controlled substances. *Hoasca* is ingested at least twice monthly at guided ceremonies lasting about four hours. Rituals during Uniao do Vegetal service include the recitation of sacred law, singing of chants by the leader, question-and-answer exchanges, and religious teaching.

Uniao do Vegetal has been officially in the United States since 1993, when its highest official visited and founded a branch in Santa Fe, New Mexico, subordinate to the Brasilia headquarters. Ap-

proximately 130 Uniao do Vegetal members currently reside in the United States, thirty of which are Brazilian citizens. The Internal Revenue Service has granted Uniao do Vegetal tax exempt status.

*Hoasca* is made by brewing together two indigenous Brazilian plants, *banisteriopsis caapi* and *psychotria viridis. Psychotria* contains DMT; *banisteriopsis* contains harmala alkaloids, known as beta-carbolines, that allow DMT's hallucinogenic effects to occur by suppressing monoamine oxidase enzymes in the digestive system that otherwise would break down the DMT. Ingestion of the combination of plants allows DMT to reach the brain in levels sufficient to significantly alter consciousness.

Because the plants do not grow in the United States, *hoasca* is prepared in Brazil by Church officials and exported to the United States. On May 21, 1999, United States Customs Service agents seized a shipment of *hoasca* labeled "tea extract" bound for Jeffrey Bronfman and Uniao do Vegetal–United States. A subsequent search of Mr. Bronfman's residence resulted in the seizure of approximately 30 gallons of *hoasca.* Although the government has not filed any criminal charges stemming from church officials' possession of *hoasca,* it has threatened prosecution; accordingly, Uniao do Vegetal has ceased using the tea in the United States.

### B. Legislation

The Controlled Substances Act makes it unlawful to "manufacture, distribute, dispense, or possess with intent to manufacture, distribute, or dispense" any controlled substance, "except as authorized" by the Act. 21 U.S.C. § 841(a)(1). Possession is also criminalized except as authorized. *Id.* § 844(a).

The CSA classifies controlled substances according to five schedules, based on required findings of a drug's safety, the extent to which it has an accepted medical use, and its potential for abuse. Schedule I, the most restrictive list, encompasses drugs with a "high potential for abuse," "no currently accepted medical use in treatment in the United States," and "a lack of accepted safety for use of the drug or other substance under medical supervision." *Id.* § 812(b)(1)(A)-(C). Included in Schedule I is "any material, compound, mixture, or preparation which contains any quantity of the following hallucinogenic substances," including DMT. *Id.* § 812. No individual or entity may distribute or dispense a Schedule I controlled substance except as part of a strictly controlled research project registered with the DEA and approved by the Food and Drug Administration, or for limited industrial purposes excluding human consumption of the substance. *Id.* § 823(f).

The 1971 United Nations Convention on Psychotropic Substances embodies an international effort "to prevent and combat abuse of [psychotropic] substances and the illicit traffic to which it gives rise." Convention, Preamble. The treaty classifies substances according to their degree of safety and medical usefulness, with Schedule I representing substances, including DMT, that are particularly unsafe and lack any medical use. Parties to the Convention, more than 160 nations in all, must "[p]rohibit all use except for scientific and very limited medical purposes." *Id.* Art. 7(a).

The Convention also bans unauthorized import and export of the substances and provides, "a preparation is subject to the same measures of control as the substance which it contains." *Id.* Art. 3(1). With respect to religious use of Schedule I substances, the Convention allows signatories to make "reservations" exempting a substance from the provisions of Article 7 under the following circumstances:

A State on whose territory plants are growing wild which contain psychotropic substances from among those in Schedule I and which are traditionally used by certain small, clearly determined groups in magical or religious rights, may, at the time of signature, ratification, or accession, make reservations concerning these plants, in respect of the provisions of article 7, except for provisions relating to international trade.

*Id.* Art. 32(4). Under this provision, the United States made a reservation for Native American religious use of peyote. Neither the United States nor Brazil has made a reservation for DMT.

The First Amendment states, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. *Employment Division, Dep't of Human Resources v. Smith* held the Free Exercise Clause did not require Oregon to exempt from its criminal drug laws the sacramental ingestion of peyote by members of the Native American Church. 494 U.S. 872, 885–890, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). Generally applicable laws, the Court concluded, may be applied to religious exercises regardless of whether the Government demonstrates a compelling interest for its rule. *Id.* By contrast, a law that is not neutral and not generally applicable "must be justified by a compelling government interest and must be narrowly tailored to advance that interest." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 531–32, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993).

The Religious Freedom Restoration Act, enacted after *Smith,* provides:

(a) In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

(c) Judicial Relief

A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim ... in a judicial proceeding and obtain appropriate relief against a government.

42 U.S.C. § 2000bb–1. RFRA restores the pre-*Smith* compelling interest test espoused in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). Congress explicitly stated, "the term 'demonstrates' means meets the burden of going forward with the evidence and of persuasion." 42 U.S.C. § 2000bb–2.

Following Congress' passage of RFRA, the Supreme Court found it unconstitutional as applied to the states. *City of Boerne v. Flores,* 521 U.S. 507, 519, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). However, because we held RFRA is binding on the federal government, *Kikumura,* 242 F.3d at 959, pre-*Boerne* case law is applicable here.

## II. Analysis

"This court reviews the grant of a preliminary injunction for abuse of discretion," which occurs when a district court "commits an error of law, or is clearly erroneous in its preliminary factual findings." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.,* 269 F.3d 1149,

1153 (10th Cir.2001) (citation omitted). We review a district court's decision on whether an interest qualifies as "compelling," a question of law, de novo. *United States v. Hardman*, 297 F.3d 1116, 1120, 1127 (10th Cir.2002). Although we have not ruled on the appropriate standard of review for a district court's analysis of "least restrictive means," *id.* at 1130, we review de novo the "ultimate determination as to whether the RFRA has been violated." *Meyers*, 95 F.3d at 1482. Likewise, we consider de novo the interpretation of the Convention. *See Utah v. Babbitt*, 53 F.3d 1145, 1148 (10th Cir.1995). We review factual findings underlying the district court's legal conclusions for clear error. *Hardman*, 297 F.3d at 1120.

The standard for a preliminary injunction is well known. A court will grant a preliminary injunction if a plaintiff shows "(1) a substantial likelihood of success on the merits of the case; (2) irreparable injury to the movant if the preliminary injunction is denied; (3) the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction; and (4) the injunction is not adverse to the public interest." *Kikumura*, 242 F.3d at 955.

█ If a preliminary injunction alters the status quo, a plaintiff must "show that on balance, the four [preliminary injunction] factors weigh heavily and compellingly in [its] favor." *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1099 (10th Cir. 1991). Altering the status quo requires a court to grant mandatory relief under which the non-moving party must take affirmative action, whereas prohibitory injunctive relief simply preserves the status quo. *See id.* (*citing* Note, 78 Harv.L.Rev. 994, 1062–63 (1965)). Here, the Government claimed the preliminary injunction alters the status quo—enforcement of the CSA and compliance with the Convention—and therefore asserted the right to relief must be proven "heavily and compellingly."

The requirement that a plaintiff seeking to alter the status quo prove the four preliminary injunction factors "heavily and compellingly" is not followed universally by federal courts.[3] Moreover, an examination of cases from our circuit demonstrates we support Wright and Miller's statement that "[i]t often is difficult to determine what date is appropriate for fixing the status quo." 11A *Charles Alan Wright, Arthur R. Miller, & May Kay Kane, Fed-*

---

**3.** The requirement that a plaintiff seeking to alter the status quo prove the four preliminary injunction factors "heavily and compellingly" is not followed universally by federal courts. The Sixth Circuit, for instance, has wholly rejected the distinction between different standards of proof for mandatory versus prohibitory injunctive relief. In *United Food and Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Auth.*, 163 F.3d 341, 348 (6th Cir.1998), it held:

We therefore see little consequential importance to the concept of status quo, and conclude that the distinction between mandatory and prohibitory injunctive relief is not meaningful. Accordingly, we reject the Tenth Circuit's 'heavily and compellingly' standard and hold that the traditional preliminary injunctive standard—the balancing

of equities—applies to motions for mandatory preliminary injunctive relief as well as motions for prohibitory injunctive relief. *See also Sluiter v. Blue Cross and Blue Shield of Michigan*, 979 F.Supp. 1131, 1136 (E.D.Mich.1997) (refusing to apply the "heavily and compellingly" test, even though the Eastern District of Michigan had previously done so, because "maintenance of the status quo would threaten [plaintiffs'] lives"). Nor is it well developed in our circuit. We have not articulated the precise meaning of "heavily and compellingly;" instead, the heightened burden appears to influence our determination of how to balance the evidence presented on the preliminary injunction factors. Regardless, the "heavily and compellingly" standard remains a part of our jurisprudence.

*eral Practice and Procedure,* § 2948 at 137 (2nd ed.1995). Some of our cases define the status quo as that which *immediately* preceded the litigation. *See Prairie Band of Potawatomi Indians v. Pierce,* 253 F.3d 1234, 1250 (10th · Cir.2001)(status quo is situation existing at time litigation is instigated.); *SCFC ILC, Inc. v. Visa USA, Inc.* 936 F.2d 1096, 1099–1100 (10th Cir.1991)(status quo is existing status between parties at time court considers request for injunctive relief.); *Kikumura v. Hurley,* 242 F.3d 950, 955 (10th Cir.2001)(plaintiff sought to alter status quo through preliminary injunction demanding prison change existing pastoral visit policy).

Not all of our cases take such an absolute approach in defining the status quo, however. In *Valdez v. Applegate,* 616 F.2d 570 (10th Cir.1980), livestock grazers brought an action to enjoin the New Mexico Bureau of Land Management's (BLM) implementation of a grazing plan which reduced the plaintiffs' ability to graze livestock. If we were to follow the approach supported by the government here, we must read BLM's implementation of grazing limits as the status quo because that was the state of affairs immediately preceding the litigation. Without much explanation, however, the *Valdez* court held implementation of the grazing plan should be enjoined to maintain the status quo. *Id.* at 573. It follows, then, the status quo in *Valdez* was the grazing rights enjoyed by the plaintiffs prior to the implementation of the grazing plan.

Likewise, in *Dominion Video,* the court refused to "extend the definition of the status quo to *invariably* include the last status immediately before the filing of injunctive relief." 269 F.3d at 1155 (emphasis added). In *Dominion Video,* Defendant EchoStar argued the status quo was its refusal to activate Dominion subscribers in accordance with terms in a contract

between itself and Dominion. *Id.* Prior to this refusal, however, EchoStar had been activating Dominion subscribers regardless of the contract terms. Four days after EchoStar indicated it would no longer activate Dominion subscribers, Dominion brought an action seeking injunctive relief compelling EchoStar to continue its previous practice. *Id.* at 1152. This court rejected EchoStar's assertions that the status quo be confined "to the four days that preceded the filing of the motion for injunctive relief," *id.* at 1155, stating that the "last uncontested status between the parties was the four years in which EchoStar activated Dominion subscribers." *Id.*

These holdings lead us to conclude the definition of "status quo" for injunction purposes depends very much on the facts of a particular case. *Valdez* and *Dominion Video* support the position that the status quo in this case should be viewed as the time when the plaintiffs were exercising their religious freedoms before the government enforced the CSA against them. As UDV asserts in its brief, the church was possessing its sacrament and practicing its religion. *See* Aple. Br. at 53. Like *Dominion Video,* it was the government's enforcement action which *changed* the status quo and became the impetus for this litigation. *See Dominion Video,* 269 F.3d at 1155. Hence, the last *uncontested* status between the parties was the plaintiffs' uninhibited exercise of their faith. It is the government's attempt to disrupt that status that UDV seeks to enjoin.

To say the enforcement of the CSA and the Convention against UDV is the status quo ignores the part played in this case by the RFRA. Having based its complaint in RFRA, UDV asserted the existence of a prima facie case, defined as a substantial burden imposed by the federal government on a sincere exercise of religion. *See Kikumura,* 242 F.3d at 960.

The Government has conceded UDV established its prima facie case. This concession buttresses the conclusion that the status quo here is not the need to enforce the CSA but rather UDV's religious practice free from a governmentally imposed burden.

Nor do we share the concern of the dissent that because of this reasoning "any party could establish the status quo by surreptitiously engaging in behavior that violated a statute until discovered by law enforcement authorities and then claiming that it is the enforcement of existing law that amounts to a change in the status quo." It is true that under our construction, a plaintiff using a CSA-listed substance or engaging in any other federally prohibited activity could claim a RFRA violation. However, a plaintiff who held insincere religious beliefs or whose practices were not, in fact, burdened by federal laws, would not pass the prima facie stage of RFRA, and, therefore, would not escape the heightened burden of proof for the four preliminary injunction factors. *See, e.g., United States v. Meyers,* 95 F.3d 1475, 1484 (10th Cir.1996) (refusing to dismiss marijuana charges against defendant based on RFRA because his "beliefs more accurately espouse a philosophy and/or way of life rather than a 'religion' ").

Moreover, even under the standard preliminary injunction test, a court could easily dispose of claims which, while constituting a RFRA prima facie case, had already been ruled invalid. For instance, even under the standard preliminary injunction test, a plaintiff seeking to use marijuana for religious purposes would likely not be able to demonstrate a substantial likelihood of success on the merits because courts have already ruled against sacramental marijuana claims. *See, e.g., United States v. Rush,* 738 F.2d 497, 512 (1st Cir.1984) (concluding the Government has a compelling interest in banning the possession and distribution of marijuana notwithstanding the burden on religious practice).

Nor do we perceive a sinister quality to the plaintiffs' practicing their religion in secret. Indeed, history provides many examples in which then unpopular religious beliefs were not openly held. For example, the early Christian church conducted its services in the Roman catacombs. Secrecy, to the faithful, was an essential to self-preservation.

## A. Health Risks to Uniao do Vegetal Members

The district court found the evidence on the health risks to Uniao do Vegetal members from *hoasca* use was "in equipoise." The dearth of conclusive research on the effects of *hoasca* and DMT fuels the controversy in this case. One preliminary study, conducted in 1993 by Dr. Charles Grob, Professor of Psychiatry at the University of California, Los Angeles, compared 15 long-term Uniao do Vegetal members, who drank *hoasca* for several years, with 15 control subjects who never ingested the tea. Researchers administered a series of psychiatric, neuropsychological, and physical tests and compiled life story interviews. In articles published in various scientific journals, researchers reported a positive overall assessment of the safety of *hoasca.* While acknowledging the limitations of his investigation, Dr. Grob testified:

[it] did identify that in a group of randomly collected male subjects who had consumed ayahuasca for many years, entirely within the context of a very tightly organized syncretic church, there had been no injurious effects caused by their use of ayahuasca. On the contrary, our research team was consistently impressed with the very high functional status of the ayahuasca subjects.

As the Government emphasized and the district court acknowledged, DMT's Schedule I-listing represents a Congressional finding the substance "has a high potential for abuse," "no currently accepted medical use," and "a lack of accepted safety for use under medical supervision." 21 U.S.C. § 812(b)(1). Addressing the Grob study specifically, the Government highlighted methodological limitations, including the small size, male-only subjects, and selection bias. According to Dr. Alexander Walker, a Professor of Epidemiology at the Harvard School of Public Health, the selection of long-term members of Uniao do Vegetal, individuals who were able to conform to its norms over extended periods, without a similar requirement for stable, long-term, voluntary church attendance applied to the control group, ensured the *hoasca*-consuming group necessarily had a favorable psychological profile.

Testifying for the Government, Dr. Sander Genser, Chief of the Medical Consequences Unit of the Center on AIDS and Other Medical Consequences of Drug Abuse at the National Institutes of Health, testified, "existing studies have raised flags regarding potential negative physical and psychological effects" of *hoasca*. Dr. Genser cited a study in which two subjects consuming intravenously administered DMT experienced a high rise in blood pressure, and another had a recurrence of depression. Information about the dangerous effect of other hallucinogenic substances, according to Dr. Genser, raises concerns about *hoasca*. For instance, especially in individuals with pre-existing psychopathology, lysergic acid diethylamide (LSD), a hallucinogen substance that shares pharmacological properties with DMT, may produce prolonged psychotic reactions or posthallucinogen perceptual disorder, commonly known as "flashbacks," defined as the reemergence of some aspect of the hallucinogenic experience in the absence of the drug.

In response, UDV emphasized important differences in ceremonial use and reported effects of *hoasca*. UDV expert, Dr. David Nichols, Professor of Medical Chemistry and Molecular Pharmacology at Purdue University, declared, "[o]rally ingested hoasca produces a less intense, more manageable, and inherently psychologically safer altered state of consciousness." Further, he testified, the "set and setting" in which an individual takes a hallucinogen are critical in determining the experience. Dr. Grob attested to the absence of evidence of flashbacks from *hoasca* use and the milder intensity and shorter duration of *hoasca's* effects compared to those of other hallucinogens. He also declared the ritual setting of Uniao do Vegetal members' consumption minimizes danger and optimizes safety.

Adverse drug interactions stemming from the beta carbolines in *banisteriopsis* are a potential danger acknowledged by even UDV. Individuals who ingest *hoasca* while on certain medications may be at increased risk for developing serotonin syndrome, a condition caused by excessive serotonin levels with symptoms including euphoria, drowsiness, sustained rapid eye movement, overreaction of the reflexes, confusion, dizziness, hypomania, shivering, diarrhea, loss of consciousness, and death. Several types of antidepressants, among other drugs, contain selective serotonin reuptake inhibitors (SSRIs), which trigger the release of serotonin or prevent its reuptake. Monoamine oxidase (MAO) inhibitors, including *hoasca*, interfere with the metabolization of serotonin. The MAOs in *hoasca* may hinder the metabolization of greater levels of serotonin made available by the use of SSRIs.

Dr. Genser, for the Government, noted "irreversible" MAO inhibitors, which bind to an MAO molecule and may forever destroy its function, may harmfully interact

with many medicines, as well as with a chemical found in some common foods. Conceding a risk of adverse drug interactions, UDV noted the church has instituted a system screening members' use of medications. However, UDV maintained the danger is not so substantial as to warrant a government ban on sacramental *hoasca* use. First, *hoasca* does not contain irreversible MAO inhibitors, the kind associated with the most severe drug interactions. Rather, as UDV experts testified, the potential for adverse interaction is reduced and the effect of any reaction is shorter and much milder with *hoasca* than with irreversible MAOs. Second, Uniao do Vegetal leadership has carefully addressed the possible danger of adverse drug interactions. Dr. Grob declared, "[f]ollowing discussions of our concerns with physicians of the UDV, all prospective participants in ceremonial hoasca sessions have been carefully interviewed to rule out the presence of ancillary medication that might induce adverse interactions with hoasca." Finally, according to UDV, the risk of adverse drug interaction associated with *hoasca* falls within the normal spectrum of concerns. Government experts highlighted other dangerous aspects of *hoasca*, including the increased risk of psychotic episodes. Based on data collected by the medical-scientific department of the Brazilian Uniao do Vegetal, Dr. Genser testified, "pyschosis is definitely of most concern." UDV countered with expert testimony suggesting the link between psychotic disturbances and *hoasca* is coincidental, rather than causal, and that the reported very low occurrence of psychosis among church members in Brazil is equal or less than the rate in the general population.

■ We see no basis for disagreeing with the district court's characterization of the evidence as "in equipoise" and hold proper its determination the Government failed to satisfy its RFRA burden on the issue of health and safety risks of *hoasca*.

Although studies of *hoasca* are preliminary and limited, Dr. Grob's research indicates an overall positive assessment of the health effects of the substance. Dr. Nichols, expert for the UDV, cogently highlighted the differences between the effects of *hoasca* versus intravenously injected DMT. He further stressed the importance of "set and setting"—for Uniao do Vegetal, a guided, calm ceremony—in determining the psychological impact of hallucinogens.

Critical to this case is that the Government's burden under RFRA was to demonstrate a ban on *hoasca* use by the Uniao do Vegetal, not a ban on hallucinogens in general, promotes a compelling interest in health and safety. The court acknowledged if it "were employing a more relaxed standard to review the application of the CSA to the UDV's use of hoasca, it would be very reluctant to question this Congressional finding concerning DMT." But RFRA provides, "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that *application of the burden to the person*" furthers a compelling interest, not merely application of the law in general. 42 U.S.C. § 2000bb–1(b) (emphasis added). "[U]nder RFRA, a court does not consider the [law] in its general application, but rather considers whether there is a compelling government reason, advanced in the least restrictive means, to apply the [law] to the individual claimant." *Kikumura*, 242 F.3d at 962.

Thus, recitation of the criteria for listing a substance on CSA Schedule I and of the general danger of hallucinogens does not, in this record, evince a compelling government interest under RFRA. Moreover, "[e]vidence which does not preponderate or is in equipoise simply fails to meet the required burden of proof." *United States v. Kirk*, 894 F.2d 1162, 1164 (10th Cir. 1990). The Government "failed to build an

adequate record" demonstrating danger to Uniao do Vegetal members' health from sacramental *hoasca* use. *Hardman,* 297 F.3d at 1133.

## B. Risk of Diversion to Non–Religious Use

The district court concluded the evidence of risk of diversion of *hoasca* from Uniao do Vegetal to non-ceremonial users is "virtually balanced," and, accordingly, held the Government failed to meet its "difficult burden" under RFRA. Further, in a footnote, the court noted, "the specificity of Dr. Kleiman's analysis [testifying for UDV] may even tip the scale slightly in favor of Plaintiffs' position."

■ The Government argued *hoasca* used by Uniao do Vegetal would be vulnerable to diversion. Testifying for the Government, Terrance Woodworth, Deputy Director of the Drug Enforcement Administration's Office of Diversion Control, identified several factors utilized to assess a controlled substance's potential for diversion, including the existence of an illicit market, the presence of marketing or publicity, the form of the substance, and the cost and opportunity for diversion. Focusing on patterns of drug abuse in the United States, Mr. Woodworth noted a recent substantially increased interest in hallucinogens in this country. Advertisements for *hoasca* on the internet and rising consumption of the tea in Europe evince demand for *hoasca* on the illicit market.

According to Mr. Woodworth, the low level of *hoasca* currently consumed is attributable to the lack of available native plants in this country. Were Uniao do Vegetal allowed to import the tea, the likelihood of diversion and abuse would increase. Further, the fact the tea must be shipped from Brazil, where *hoasca* is unregulated, along with the uncooperative relationship between the DEA and Uniao do Vegetal, suggest an exemption for sac-ramental use would result in illegal diversion.

Dr. Jasinski, Professor of Medicine at the Johns Hopkins School of Medicine, a Government witness, stated he believes the risk of abuse of *hoasca* is substantial. In his view, positive reinforcing, or "euphoric," effects—"the transient alterations in mood, thinking, feeling, and perceptions produced by [a] drug"—are the primary factors leading individuals to try and repeatedly use a drug of abuse. Dr. Jasinski noted research on intravenously injected DMT and preliminary studies on *hoasca* indicate these substances produce euphoric effects, although those of *hoasca* "are slower in onset, milder in intensity, and longer in duration."

While acknowledging the negative effects of *hoasca,* nausea and vomiting, may act as a deterrent to some people, Dr. Jasinski pointed out the percentage of users who vomit is unknown, and, regardless, the negative effects may not outweigh the positive to the extent necessary to deter use. Further, he testified the pharmacological similarities between LSD, recognized to have abuse potential, and DMT support an inference *hoasca* has substantial abuse potential.

By contrast, UDV maintained *hoasca* does not carry significant potential for abuse or diversion. UDV expert, Dr. Kleiman, Professor of Policy Studies at the University of California, Los Angeles, reported the negative effects of *hoasca* and availability of pharmalogically equivalent substitutes indicate demand for the substance would be low. Hallucinogen users may not tolerate nausea and vomiting. Dr. Kleiman has written:

hallucinogen substances, including DMT, score much lower on scales measuring reinforcement, and have much less tendency to create dependency, than opiates, such as heroin ... a much smaller

proportion of hallucinogen users than of opiate users would be so strongly driven to seek out the drug experience as to neglect the presence of side-effects.

Further, the tea-like mixture ingested by Uniao do Vegetal members would not be particularly attractive to individuals seeking an oral DMT experience. Instead, "any preparation that included DMT and a sufficient quantity of any monoamine oxidase inhibitor would suffice." Plants containing DMT and harmala alkaloids are available in the United States, some of which when combined do not induce vomiting. Dr. Kleiman declared, "the widespread availability of pharmacologically equivalent substitutes, some of them with fewer unwanted side-effects and less apparent legal risk, would greatly reduce the motivation to divert the sacramental material for the purposes of drug abuse."

Dr. Kleiman also recounted other factors he believes would counteract *hoasca* diversion. First, Uniao do Vegetal–United States is a very small church and would only import about 3,000 doses per year from Brazil. Second, the relatively thin potential market for *hoasca* would reduce the likelihood of diversion that might occur with widely-used drugs. An individual illegally in possession of *hoasca* would have greater trouble locating a buyer than a cocaine thief. Third, the bulky form of *hoasca* would deter diversion. Dr. Kleiman stated, "[t]he ease of stealing goes up as the volume goes down. The larger the volume, the harder something is to steal." Finally, Uniao do Vegetal has strong incentives to keep its *hoasca* supply from being diverted, as ingestion of the tea outside the sacramental context is considered sacrilegious.

We see no clear error in the district court's characterization of the evidence on the potential for diversion as "virtually balanced." Upon de novo review, we agree with the court's legal conclusion that

the Government failed to demonstrate a compelling interest. Notwithstanding the competent reports of experts Mr. Woodworth and Dr. Jasinski, speculation based on preliminary *hoasca* studies and generalized comparisons with other abused drugs, particularly in the face of Dr. Kleiman's powerful contradictory testimony, does not suffice to meet the Government's onerous burden of proof.

## C. United Nations Convention on Psychotropic Substances

Believing the Government's strongest arguments for prohibiting Uniao do Vegetal's *hoasca* use to be health and diversion risks, the district court did not ask the parties to present evidence on the Convention at the hearing. However, in issuing a preliminary injunction, the court qualifiedly rejected the Government's assertion that the Convention requires the United States ban Uniao do Vegetal's sacramental *hoasca* use. The court concluded the treaty does not cover *hoasca*.

On appeal, the parties take opposing views of whether the Convention's proscription includes *hoasca*. At this point, we do not believe the resolution of this argument is necessary to the appeal. We therefore decline to grant what could only amount to an advisory opinion.

Although "treaties are recognized by our Constitution as the supreme law of the land," *Breard v. Greene*, 523 U.S. 371, 376, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998) (per curiam), that rule does not decide this case. Here we are presented with a conflict between the government's obligations under the 1971 Convention and its obligations under RFRA. In such a situation, the Supreme Court has directed "that an Act of Congress . . . is on a full parity with a treaty, and that when a statute which is subsequent in time is inconsistent with a treaty, the statute, to the extent of conflict,

**1184**

renders the treaty null." *Id.* (*quoting Reid v. Covert,* 354 U.S. 1, 18, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (plurality opinion)). *See also Whitney v. Robertson,* 124 U.S. 190, 194, 8 S.Ct. 456, 31 L.Ed. 386 (1888) (if treaty and statute conflict, "the one last in date will control the other").

 Thus, even if the Convention does apply to *hoasca,* the United States has obligations under its laws and other international treaties to protect religious freedom. Treaties are part of the law of the land; they have no greater or lesser impact than other federal laws. *Ex parte Cooper,* 143 U.S. 472, 502, 12 S.Ct. 453, 36 L.Ed. 232 (1892). "The freedom to manifest religion . . . in worship, observance, practice and teaching encompasses a broad range of acts" including "ritual and ceremonial acts" and "participation in rituals." *U.N. Hum. Rts. Comm., General Comment No. 22,* at 4 (1993). Moreover, a compelling interest in abiding by certain laws, including the CSA and the Convention, does not suffice, standing alone, to carry the Government's burden under RFRA. *Hardman,* 297 F.3d at 1125. RFRA requires that an asserted compelling interest be narrowly tailored to the specific plaintiff whose religious conduct is impaired. *Id.*

The Government cites the declaration of Robert E. Dalton, a State Department lawyer for the Treaty Affairs Office, opining that, "[t]he need to avoid a violation of . . . the treaty . . . is undoubtedly a compelling interest," and that violation of the Convention would undermine the United States' leadership role in curtailing illicit drug trafficking. Yet, Mr. Dalton speaks only in the most general of terms regarding the United States' interest in complying with the 1971 Convention, and he does not provide any specifics about why such compliance, resulting in the burdening of the UDV's religious freedoms, represents the least restrictive means of furthering

the government's compelling interests. This statement falls short of the government's burden. *See* 42 U.S.C. § 2000bb–1(b); *Hardman,* 297 F.3d at 1130–32 (mere speculation or a "record devoid of hard evidence indicating that the current regulations are narrowly tailored to advance the government's interests" which "does not address the possibility of other, less restrictive means of achieving" those interests is insufficient to satisfy the government's burden under RFRA). Based on the record before us, we cannot conclude the government has demonstrated that "application of the burden to the [UDV] (1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest." 42 U.S.C. § 2000bb–1(b).

## D. Additional Arguments

Congress has indicated courts should look to cases predating *Smith* in construing and applying RFRA. *See* H.R.Rep. No. 103–88, 103d Cong., 1st Sess., at 6–7 (1993). Importantly, however, Congress' purpose in enacting RFRA was to restore the legal standard applied in pre-*Smith* decisions, rather than to reinstate actual outcomes. S.Rep. No. 103–111, 103d Cong., at 9, *reprinted in* 1993 U.S.C.C.A.N. 1892, 1898.

The district court correctly distinguished on two grounds cases cited by the Government denying individuals' free exercise challenges to drug laws. First, the sincerity of the Uniao do Vegetal faith and the substantial burden the CSA imposes on the practice of the religion are uncontested. By contrast, courts in other RFRA cases cited by the Government have found the plaintiff's beliefs are not religious, are not sincerely held, or are not substantially burdened by governmental action.

For instance, in *United States v. Meyers*, involving a criminal defendant who moved under RFRA to dismiss the marijuana charges brought against him, we held in light of the secular nature of Mr. Meyers' views on the medical, therapeutic, and social benefits of marijuana, "Meyers' beliefs more accurately espouse a philosophy and/or way of life rather than a 'religion.'" 95 F.3d. at 1484. Likewise, in cases involving Rastafarianism, where marijuana is a sacrament, the Ninth Circuit concluded the religion did not require distribution, possession with intent to distribute, and money laundering, *United States v. Bauer*, 84 F.3d 1549, 1559 (9th Cir.1996); or the importation of marijuana, *Guam v. Guerrero*, 290 F.3d 1210, 1223 (9th Cir.2002). However, in *Bauer*, the Ninth Circuit held the district court erred in prohibiting the defendants from using RFRA as a defense to simple possession charges. 84 F.3d at 1559.

Second, *hoasca* and marijuana differ. Marijuana is associated with problems of abuse and control, leading courts to ascertain a particular government interest in its prohibition even for religious uses. *United States v. Greene*, 892 F.2d 453, 456–57 (6th Cir.1989) ("Every federal court that has considered this issue has accepted Congress' determination that marijuana poses a real threat to individual health and social welfare and has upheld criminal penalties for possession and distribution even where such penalties may infringe to some extent on the free exercise of religion."). As the D.C. Circuit observed in acknowledging the legality of the Native American Church's use of peyote but refusing to grant a religious exemption to marijuana, Uniao do Vegetal's use of *hoasca* occurs in a "traditional, precisely circumscribed ritual" where the drug "itself is an object of worship" and using the sacrament outside the religious context is a sacrilege. *Olsen v. DEA*, 878 F.2d 1458, 1464 (D.C.Cir. 1989).

According to the Government's reading of precedent involving marijuana and LSD, the Schedule I listing of DMT is enough, standing alone and without further proof of adverse health effects, to demonstrate a compelling interest in a ban on all *hoasca* use. In *United States v. Rush*, for instance, the First Circuit, concluding the Government has a compelling interest in banning the possession and distribution of marijuana notwithstanding the burden on religious practice, found, "Congress has weighed the evidence and reached a conclusion which it is not this court's task to review *de novo*." 738 F.2d 497, 512 (1st Cir.1984). The *Rush* court declined "to second-guess the unanimous precedent." *Id.* at 512–13.

Along with *United States v. Oakland Cannabis Buyers' Cooperative*, 532 U.S. 483, 493, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001), *Rush* affirms courts should accord great deference to Congress' classification scheme in the CSA and "be cautious not to rewrite legislation." *Marshall v. United States*, 414 U.S. 417, 427, 94 S.Ct. 700, 38 L.Ed.2d 618 (1974). As the district court in the present case acknowledged, the legislative branch's placement of materials containing DMT in Schedule I reflects a finding such substances have a high potential for abuse and no currently accepted medical use, and lack safety even if used under medical supervision. 21 U.S.C. § 812(b)(1). Nevertheless, through RFRA, Congress mandated courts to consider whether the application of the burden to the claimant "is in furtherance of a compelling government interest." 42 U.S.C. § 2000bb–1(b). Mere recitation of Congressional findings of a general danger is insufficient to satisfy RFRA.

The Government advanced several additional compelling interests: the uniform application of the CSA, the need to avoid burdensome and constant official supervi-

sion and management of Uniao do Vegetal, and the possibility of opening the door to myriad claims for religious exceptions. Averring these arguments were raised for the first time on appeal, UDV urged us not to consider them. *McDonald v. Kinder–Morgan, Inc.*, 287 F.3d 992, 999 (10th Cir. 2002)[4] ("[A]bsent extraordinary circumstances, we will not consider arguments raised for the first time on appeal. This is true whether an appellant is attempting to raise 'a bald-faced new issue' or 'a new theory on appeal that falls under the same general category as an argument presented at trial.' ") (citation omitted). We do not believe the Government's additional compelling interests constitute "bald-faced new issue[s]" or a "new theor[ies]." Rather, finding they fall into the same general category of arguments raised below regarding the interpretation of the CSA and risk of diversion, we address them.

■ We conclude the Government's additional alleged compelling interests are unavailing. First, we do not believe uniform application of the CSA warrants denial of an exemption for Uniao do Vegetal's sacramental *hoasca* consumption. For reasons stated above, cases involving marijuana, heroin, and LSD are distinguishable. The Government argued the existence of the 1994 amendment to the American Indian Religious Freedom Act, providing a statutory exemption from state prosecution of Native American Church's peyote use, indicates RFRA alone could not sustain an exemption for ceremonial peyote. Likewise, argued the Government, RFRA cannot here support a *hoasca* exemption. But, while the 1994 amend-

ment gave the Native American Church a legislative categorical exemption, RFRA rests the outcome on the government's proof. RFRA only provides access to the courts, placing on the government the burden of justifying a ban on a religious use of a controlled substance. Federal protection of peyote existed well before RFRA; the statute protected the Native American Church only from state prosecution.

Second, the relatively unproblematic state of peyote regulation and use belies the Government's claimed need for constant official supervision of Uniao do Vegetal's *hoasca* consumption. The DEA does not closely monitor the Native American Church's peyote use, guard the mountains in Texas on which peyote is grown, nor monitor the distribution of peyote outside of Texas. Since its legalization for use by the Native American Church in 1966, peyote remains extremely low on the list of abused substances. While thus far the relationship between Uniao do Vegetal and the DEA has been adversarial, allowing an exemption for religious use might lead to a cooperative relationship similar to the one between the government and the Native American Church. Regardless, the Government cannot overcome RFRA by alleging an increased need for resources.

Third, the specter of a slew of claims for religious exemptions to the CSA does not evince a compelling interest under RFRA. Our ruling in the present appeal in no way calls into question cases refusing to grant an exemption to the CSA for marijuana, LSD, heroin, or any other controlled substances. UDV's position is distinct, and as

---

**4.** UDV offered an alternative ground on which we can affirm the district court's result: equal protection. Because the Native American Church's use of peyote is protected, so too should Uniao do Vegetal's use of *hoasca*. The district court disagreed, and we affirm. As the court noted, our government has a special relationship with Native American

tribes, rendering the Uniao do Vegetal and Native American Church disparately situated despite similarities in religious practice. *Peyote Way Church of God v. Thornburgh,* 922 F.2d 1210, 1216 (1991) (Fifth Circuit holding the disparate treatment of Native American peyote religion justified by the government's trust relationship with Native Americans).

RFRA requires, we have looked at the specific circumstances of Uniao do Vegetal's ceremonial *hoasca* use and assessed the Government's asserted compelling interests. While we need not consider the CSA in a vacuum, the bald assertion of a torrent of religious exemptions does not satisfy the Government's RFRA burden. Moreover, we leave open the possibility that future evidence of the health effects and diversion potential may allow the Government to prove a compelling interest in enforcing of the CSA against *hoasca's* sacramental use.

## III. Conclusion

For these reasons, at this juncture, we hold UDV has demonstrated a substantial likelihood of success on the claim for an exemption to the CSA for sacramental *hoasca* use. We find the other conditions for granting a preliminary injunction present as well. Because "a plaintiff satisfies the irreparable harm analysis by alleging a violation of RFRA," *Kikumura*, 242 F.3d at 963, we conclude the irreparable harm requirement for a preliminary injunction is satisfied. On the balance of the harms and adversity to the public interest, we recognize the importance of enforcement of criminal laws, including the CSA. *New Motor Vehicle Board v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351, 98 S.Ct. 359, 54 L.Ed.2d 439 (1977) (in a case involving enforcement of the California Automobile Franchise Act, noting a state "suffers a form of irreparable injury" any time it "is enjoined by a court from effectuating statutes enacted by representatives of its people"). Nevertheless, as RFRA—a statute enacted by representatives of the people to protect religious freedom—acknowledges, harm ensues from the denial of free exercise and the public has a significant inter-

est in unburdened legitimate religious expression. Given the critical evidence in support of the Government's alleged compelling interests was "in equipoise" and "virtually balanced," we agree with the district court that UDV has demonstrated the balance of harms and public interest tip in their favor. We **AFFIRM.** No. 02–2323, *O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft*

MURPHY, Circuit Judge, dissenting.

The majority affirms a preliminary injunction prohibiting the United States[1] from enforcing the Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq.*, thereby placing the United States in violation of the United Nations Convention on Psychotropic Substances, Feb. 21, 1971 (the "Convention"), 32 U.S.T. 543. Because the majority utilizes the wrong standard in determining whether O Centro Espirita Beneficiente Uniao do Vegetal ("UDV") has made the necessary showing for obtaining a preliminary injunction, and because UDV has not shown that the preliminary injunction factors weigh heavily and compellingly in its favor, I respectfully dissent.

## I. Improper Standard for Preliminary Injunction

The United States asserts that the district court abused its discretion in granting UDV a preliminary injunction because it utilized an improper standard. *See SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir.1991) ("We will set aside a preliminary injunction if the district court applied the wrong standard when deciding to grant the preliminary injunction motion."). In particular, the United States asserts that because the preliminary in-

1. Each of the defendant-appellants in this case is an officer of the United States sued in his official capacity.

junction requested by UDV alters the status quo, the district court should have required UDV to "show that on balance, the four [preliminary injunction] factors weigh heavily and compellingly in [its] favor." *Id.* at 1099. The majority's response to this argument is two-fold: (1) "the last *uncontested* status between the parties was the plaintiffs' uninhibited exercise of their faith," Majority Op. at 1178 (alteration in original); and (2) UDV's establishment of a *prima facie* case under the Religious Freedom Restoration Act "buttresses the conclusions that the status quo here is not the need to enforce the CSA but rather UDV's religious practice free from a governmentally imposed burden," *id.* at 1179. Neither of the reasons posited by the majority for concluding that the status quo favors UDV's use of *hoasca* is convincing.

The majority's conclusion that the status quo in this case is contingent on the merits of UDV's RFRA claim is clearly at odds with binding Tenth Circuit precedent. In *SCFC ILC*, the proponent of a preliminary injunction argued that the preliminary injunction entered by the district court preserved the status quo because it was entitled to the relief afforded in the preliminary injunction under various federal and state laws. 936 F.2d at 1099. This court explicitly rejected the contention that the status quo is measured by the parties' legal rights, holding as follows:

> MountainWest confuses "what should be" with "what is." While [Plaintiff] may eventually succeed in convincing the district court, on the merits, to order Visa to issue the cards to it, a final decision so holding would unquestionably alter the status quo. The status quo is not defined by the parties existing *legal rights;* it is defined by the *reality* of the existing status and relationships between the parties, regardless of whether the existing status and relation-

ships may ultimately be found to be in accord or not in accord with the parties' legal rights.

*Id.* at 1100 (footnote omitted).

Despite the clear and unambiguous language in *SCFC ILC* defining the status quo by reference to the reality of the parties' existing status and relationship, as opposed to the parties' legal rights, the majority concludes that the status quo in this case should be measured with reference to the parties' litigation positions, i.e., whether UDV established the existence of a *prima facie* case under RFRA. *See* Majority Op. at 1178–79. The majority, like the proponent of the preliminary injunction in *SCFC ILC*, has "confuse[d] 'what should be' with 'what is.'" 936 F.2d at 1100. In so doing, the majority has carved out the following special rule in RFRA cases: the status quo ante is irrelevant when the proponent of an injunction has submitted evidence establishing a *prima facie* case under RFRA. This special rule, however, is at odds with *SCFC ILC. See In re Smith,* 10 F.3d 723, 724 (10th Cir.1993) (per curiam) ("We cannot overrule the judgment of another panel of this court. We are bound by the precedent of prior panels absent en banc reconsideration or a superseding contrary decision by the Supreme Court.").

Nor is the majority correct in asserting that the status quo in this case is UDV's use of *hoasca* because it was the government's enforcement of the CSA that was the impetus for the present litigation. Majority Op. at 1178. As noted by the panel that stayed the district court's preliminary injunction pending appeal, the status quo in this case is the enforcement of the CSA and compliance with the Convention. *See O Centro Espirita Beneficiente Uniao De Vegetal (USA), Inc. v. Ashcroft,* 314 F.3d 463, 466 (10th Cir.2002). The record makes clear that both the UDV itself and the United States recognized

that the importation and consumption of *hoasca* violated the CSA.

The UDV has made a concerted effort to keep secret their importation and use of *hoasca*. On the relevant import forms, UDV officials in the United States generally referred to *hoasca* as an "herbal tea"; they never called it *hoasca* or ayahuasca or disclosed that it contained DMT. UDV president Jeffrey Bronfman informed customs brokers that the substance being imported was an "herbal extract" to be used by UDV members as a "health supplement." Furthermore, in an e-mail drafted by Bronfman, he emphasized the need for confidentiality regarding UDV's "sessions" involving *hoasca:* "Some people do not yet realize what confidentiality is and how careful we need to be. People should not be talking publicly anywhere about our sessions, where we have them and who

attends them." Finally, when UDV attempted to grow *psychotria viridis* and *banisteriopsis caapi* in the United States, it imported the seeds and plants "clandestinely," in the words used by UDV, and required its members to sign confidentiality agreements to keep their attempts secret. All of these actions by plaintiff UDV demonstrate a recognition that its importation and consumption of *hoasca* violated the CSA. Likewise, when the United States realized that UDV was importing a preparation which contained DMT, it seized that shipment and additional quantities of the preparation found in a search of Bronfman's residence. Accordingly, although UDV eventually sought a preliminary injunction after the seizure of the *hoasca*, at all times leading up to that event the record reveals that the status quo was the enforcement of the CSA.[2]

---

**2.** UDV baldly asserts in its brief on appeal that "[t]he 'status quo' before this litigation was that the plaintiffs possessed their sacrament and practiced their religion. Defendants' conduct changed the status quo, and did not create the status quo." UDV Brief at 53–54. Under this theory, any party could establish the status quo by surreptitiously engaging in behavior that violated a statute until discovered by law enforcement authorities and then claiming that it is the enforcement of existing law that amounts to a change in the status quo. UDV's assertion might have some persuasive force if it had openly imported and consumed *hoasca* **and the United States had acquiesced in those actions for a period of time** before changing course and enforcing the CSA. Under the facts of this case, however, UDV's assertion is meritless. Unfortunately, the majority signs off on UDV's argument and makes it the law of this circuit. *See* Majority Op. at 1178. I simply fail to see how UDV's importation and use of *hoasca* can be called "uncontested" when the government was not aware of the importation and consumption as a direct result of UDV's efforts to keep the matter secret.

For this reason, the majority can take no comfort in *Valdez v. Applegate*, 616 F.2d 570, 573 (10th Cir.1980) or *Dominion Video Satellite v. EchoStar Satellite Corp.*, 269 F.3d 1149,

1153 (10th Cir.2001). *See* Majority Op. at 1177–78. In *Valdez*, the plaintiffs had been grazing their cattle in the Rio Puerco Grazing District, a 500,000 acre plot of land encompassing federal, state, and private lands. 616 F.2d at 571. The federal government adopted a revised grazing program which reduced the plaintiffs' ability to graze their livestock. *Id.* The plaintiffs promptly sought a preliminary injunction claiming that the revised grazing program was contrary to federal law in several respects. *Id.* On these facts, it is certainly not surprising this court determined that the status quo was the grazing program in effect prior to the government's proposed revisions. The same is true in *Dominion Video*. In that case, that parties had an ongoing business relationship, wherein EchoStar had been activating Dominion customers to receive Sky Angel satellite programming over a four-year period, despite a serious question whether EchoStar was contractually obligated to do so. 269 F.3d at 1155. When EchoStar declined to activate any further Dominion customers, Dominion immediately brought suit. *Id.* This court rejected EchoStar's contention that the four-day period in which it declined to activate further Dominion customers represented the status quo, holding as follows: "Adopting EchoStar's position would imply that any party could create a new status quo immediately preceding the litigation *merely by*

Because the district court did not recognize that the preliminary injunction requested by UDV would alter the status quo, it failed to require UDV to carry the onerous burden of demonstrating that the four preliminary injunction factors weigh heavily and compellingly in its favor. Accordingly, the district court abused its discretion in issuing the preliminary injunction. *SCFC ILC,* 936 F.2d at 1100. That conclusion, however, does not compel a remand to the district court. Because the record in this case is sufficiently well developed, it is appropriate for this court to determine whether UDV has satisfied its burden of demonstrating that the preliminary injunction factors weigh heavily and compellingly in its favor. *Id.*

## II. Balance of Injury and Public Interest

I have serious reservations concerning the district court's and majority's conclusion that the United States did not carry its burden of demonstrating that the prohibition against importing or consuming *hoasca* furthers its compelling interests in protecting the health of UDV members and preventing diversion of *hoasca* to non-religious uses. It is unnecessary to reach those questions, however, because UDV did not carry its burden of demonstrating that the third and fourth preliminary injunction factors—that the threatened injury to it outweighs the injury to the United States under the preliminary injunction and that the injunction is not adverse to the public interest—weigh heavily and compellingly in its favor.

As noted by this court in staying the preliminary injunction pending appeal, the United States suffers irreparable injury when it is enjoined from enforcing its criminal laws. *O Centro Espirita,* 314 F.3d at 467 (citing *New Motor Vehicle Bd. v. Orrin W. Fox Co.,* 434 U.S. 1345, 1351, 98 S.Ct. 359, 54 L.Ed.2d 439 (1977) (Rehnquist, Circuit Justice)). This injury to the United States is exacerbated by the fact that any preliminary injunction issued by the district court, as illustrated by the numerous conditions and obligations imposed on the United States by the preliminary injunction actually issued by the district court, would require burdensome and constant official supervision and oversight of UDV's handling and use of *hoasca.*[3] *Id.* (collecting cases and examples). UDV has not carried its burden of demonstrating that the balancing of its injury with that of the government weighs heavily and compellingly in its favor.

Furthermore, Congress has specifically found that the importation and consumption of controlled substances is adverse to the public interest. 21 U.S.C. § 801(2)

---

changing its conduct toward the adverse party." *Id.* (emphasis added).

As noted at length above, it cannot legitimately be argued that the government "changed its conduct" toward UDV. Both the government and UDV have consistently understood that the importation and consumption of DMT violates both the Convention and the CSA. The United States did not take any previous enforcement action against UDV only because UDV was successful at hiding its illegal conduct. As soon as the government became aware of UDV's illegal activities, it seized the *hoasca* and enforced the CSA. This situation is entirely unlike the situations in *Valdez* and *Dominion Video.*

**3.** Even a cursory review of the district court's eleven page, thirty-six paragraph preliminary injunction belies the majority's assertion that it preserves, rather than alters, the status quo. As noted at length above, prior to the district court's entry of the preliminary injunction, UDV was surreptitiously importing *hoasca* with the clear knowledge that it was violating the CSA in the process. The district court's preliminary injunction modifies or enjoins enforcement of a staggering number of regulations implementing the CSA, with the result being that the United States must actually set about to aid UDV in the importation of an unlimited supply of *hoasca.*

("The illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people."); *id.* § 801a(1) ("The Congress has long recognized the danger involved in the manufacture, distribution, and use of certain psychotropic substances ..., and has provided strong and effective legislation to control illicit trafficking and to regulate legitimate uses of psychotropic substances in this country."). In fact, the district court specifically found that the evidence was in equipoise as to the risk of diversion of *hoasca* to non-religious purposes and the danger of health complications flowing from *hoasca* consumption by UDV members. Although this led the district court to conclude that the United States had not carried its burden of demonstrating that the restrictions in the CSA against the importation and consumption of *hoasca* furthered the United States' compelling interests and that, concomitantly, UDV was substantially likely to prevail on the merits of its Religious Freedom Restoration Act claim, the United States has no such burden at the third and fourth steps of the preliminary injunction analysis. At this stage, it is UDV that must demonstrate heavily and compellingly that the requested preliminary injunction is not adverse to the public interest. In light of the congressional findings noted above and the equipoised nature of the parties' evidentiary submissions, UDV has not met its burden.

## III. Violation of the Convention

Finally, the United States argues convincingly that a preliminary injunction requiring it to violate the Convention could seriously impede its ability to gain the cooperation of other nations in controlling the international flow of illegal drugs. *See* 21 U.S.C. § 801a(1) ("Abuse of psychotropic substances has become a phenomenon common to many countries ... and is not confined to national borders. It is, therefore, essential that the United States cooperate with other nations in establishing effective controls over international traffic in such substances."); *see also O Centro Espirita,* 314 F.3d at 467 (noting that federal courts should be reluctant to second guess the executive regarding the conduct of international affairs).

The majority fails to consider this factor in determining whether UDV has carried its burden of establishing its entitlement to a preliminary injunction because, according to the majority, even assuming the Convention does cover *hoasca,* the government failed to demonstrate that such an interest must "be narrowly tailored to the specific plaintiff whose religious conduct is impaired." Majority Op. at 1184. What the majority apparently fails to realize, however, is that the meaning of the Convention is relevant not only with regard to the first preliminary injunction factor, likelihood of success on the merits, but also with regard to the third and fourth preliminary injunction factors, the balancing of harms and the adversity of the injunction to the public interest.[4]

---

**4.** Although it is not quite clear, the majority's opinion could be read to state the proposition that the government's interest in complying with its obligations under the Convention are not compelling because those obligations conflict with the government's obligations under RFRA. Majority Op. at 1183–84. The majority further seems to assert that because RFRA was enacted after the Convention was ratified, the Convention is thereby nullified to the extent it conflicts with RFRA. *Id.* The majority

is simply wrong in asserting that there is any kind of inherent conflict between RFRA and the Convention. Although RFRA prohibits the government from burdening a person's exercise of religion unless the burden furthers a compelling governmental interest, it does not attempt to define which interests are compelling. 42 U.S.C. § 2000bb–1 (providing that the government may not substantially burden a person's exercise of religion unless

The district court concluded that the Convention distinguishes between a "substance" in which the psychoactive component is derived but not "separated" from the plant source, versus a "substance," which is a purified form of the psychoactive drug. Because, according to the district court, plants like *psychotria viridis* are not covered by the Convention, neither are "infusions and beverages" made from such plants, even if the infusion or beverage contains a Schedule I psychotropic chemical. In reaching this conclusion, the district court relied almost exclusively on the 1976 United Nations Commentary on the Convention on Psychotropic Substances (the "Commentary"). The district court's interpretation of the Convention and its reliance on the Commentary is fundamentally flawed.

The Convention defines a "preparation" as "any solution or mixture, *in whatever physical state*, containing one or more psychotropic substances, or [ ] one or more psychotropic substances in dosage form." Convention, 32 U.S.T. 543, Art. 1(f) (emphasis added). *Hoasca* clearly fits within the plain language of this definition. It is a solution or mixture, in a liquid state, containing the psychotropic substance DMT. The Convention further provides that "a preparation is subject to the same measures of control as the psychotropic substance which it contains." *Id.* Art. 3(1).

Accordingly, *hoasca* is subject to the same controls applicable to DMT in a pure, separated form.

The district court appears to be have been led astray by UDV's focus on Article 32 of the Convention and its assertion that Article 32 supports the proposition that plants may receive different treatment than the chemical components contained within the plants. Whether plants are covered by the Convention, however, is irrelevant. UDV does not seek to import and use plants that contain DMT; rather, it seeks to import, possess, and consume a preparation made from such a plant that can have no use other than to produce a drug-induced state, albeit in a sacramental context. In any event, UDV is simply incorrect in asserting that Article 32 supports its assertion that *hoasca* is not a preparation covered by the Convention because it is derived from a plant. Article 32 provides as follows:

> A State on whose territory there are plants growing wild which contain psychotropic substances from among those in Schedule I and which are traditionally used by certain small, clearly determined groups in magical or religious rites, may, at the time of signature, ratification or accession, make reservations concerning these plants, in respect of the provisions of article 7, except for the provisions relating to international trade.[5]

the application of the burden to that person both furthers a compelling governmental interest and does so in the least restrictive manner). What RFRA does do is set out a decisional framework within which a court is to apply the law as it existed prior to the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). Under this decisional framework, it is certainly possible that the government can advance a compelling interest in support of any action that burdens a person's exercise of religion, but that the governmental action will still need to be enjoined because it will not be the least restrictive means of advancing the compelling interest.

In those circumstances, it cannot be said that the governmental interest is not compelling. The question of whether a governmental interest is compelling is wholly independent of the question whether the burden flowing from the advancement of that interest fits within the contours of RFRA. In apparently concluding that the government's interest in complying with the Convention is not compelling because it is "in conflict" with RFRA, the majority has compounded its error.

5. Article 7 of the convention obligates signatory nations to prohibit all uses of Schedule I substances, with certain very limited exceptions not relevant here, and to prohibit the

Convention, 32 U.S.T. 543, Art. 32(4). Article 32 actually suggests that plants are covered by the Convention, inasmuch as the Convention requires signatories to make reservations in order to allow their use. Article 32 also makes clear that even if a signatory makes a reservation, international trafficking in such plants is still prohibited by the Convention.[6]

The plain language of Article 7, coupled with the conforming interpretation of the Convention by the State Department, demonstrates that *hoasca* is a preparation covered by the Convention.[7] The congressional findings in 21 U.S.C. § 801a(1) make clear that international cooperation and compliance with the Convention is essential in providing effective control over the cross-border flow of such substances. UDV has not carried its burden of demonstrating heavily and compellingly that its interest in the use of sacramental *hoasca* pending the resolution of the merits of its complaint outweighs the harm resulting to the United States from a court order mandating that it violate the Convention. Nor has it shown heavily and compellingly that such an injunction is not adverse to the public interest.

import and export of those substances. Convention, Art. 7, 32 U.S.T. 543. It bears emphasizing, however, that Article 32, which allows signatory nations to make a reservation with regard to the use of certain plants like *psychotria viridis* in religious rites, **does not** allow signatories to opt out of the requirement that they prohibit the import or export of those plants. *Id.* Art. 32(4).

6. Because the definition of "preparation" is clear and unambiguous, this court is obligated to give it its ordinary meaning absent "extraordinarily strong contrary evidence." *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 185, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982). Nevertheless, the district court ignored that clear and unambiguous language in favor of language in the Commentary appearing to indicate that beverages and infusions made from plants containing hallucinogenic substances do not fall within the Convention. The Commentary notes that "[n]either ... the roots of the plant Mimosa hostilis nor Psilocybe mushrooms themselves are included in Schedule I, but only their respective active principles." Commentary at 387. In two footnotes, the Commentary observes generally that "[a]n infusion of roots is used" to consume Mimosa hostilis and that "[b]everages ... are used" to consume Psilocybe mushrooms. *Id.* at 387 nn. 1227–28.

The Commentary does not constitute extraordinarily strong contrary evidence. It was drafted by a single author, published five years after the Convention was negotiated, and is, at most, ambiguous on the question whether a preparation like *hoasca,* as opposed to the plant *psychotria viridis,* is covered by the Convention. Because the Commentary was not written by the negotiators or signatories to the Convention, it is not the sort of "negotiating and drafting history" or "postratification understanding of the contracting parties" that courts have traditionally used as evidence of the signatories' intent. *See Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 226, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996). On the other hand, the interpretation of an international treaty by the United States agency charged with its negotiation and enforcement is entitled to "great weight" from the courts. *Kolovrat v. Oregon*, 366 U.S. 187, 194, 81 S.Ct. 922, 6 L.Ed.2d 218 (1961). The State Department has interpreted the Convention to cover preparations such as *hoasca.* The State Department's interpretation is consistent with the plain language of the Convention and this court is obliged to accord it deference.

7. For these reasons, the district court erred in concluding that compliance with the Convention does not constitute a compelling interest. Nevertheless, because this case can be resolved based solely on UDV's failure to carry its burden under the third and fourth preliminary injunction factors, I see no need to remand the case to the district court to analyze whether the restrictions contained in the CSA are the least restrictive means of furthering the United States' compelling interest in complying with the Convention.

## IV. Conclusion

For those reasons set out above, I would reverse the district court's entry of a preliminary injunction in favor of UDV. Accordingly, I respectfully dissent.